# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN THE MATTER OF THE SEARCH INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBERS **(503) 869-4625** **(859) 494-1123** **(859) 285-4097** THAT IS STORED AT PREMESES CONTROLLED BY AT&T | * * * * * * |

\* \* \*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Melanie Star Dry, a Special Agent with Homeland Security Investigations, being duly sworn, depose and state as follows:

### I.

### INTRODUCTION

1. I submit this affidavit in support of an application for a search warrant for information associated with a certain cellular telephones assigned call number **(503) 869-4625 (SUBJECT PHONE 1), (859) 494-1123 (SUBJECT PHONE 2) and (859) 285-4097 (SUBJECT PHONE 3)** that are stored at premises controlled by **AT&T,** a wireless telephone service provider headquartered at **11760 U.S. Highway 1, Suite 600 North Palm Beach, Florida 33408.** The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(l)(A) to require **AT&T** to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I, Melanie Star Dry, am a Special Agent with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"),

assigned to the office of the Special Agent in Charge ("SAC") in Nashville, Tennessee. I have been a Special Agent since June 2022 and I am assigned to the Resident Agent (RA) office in Lexington, Kentucky. As part of my duties, I am authorized to investigate violations of the laws of the United States, including criminal violations of United States Code chapters 8, 18, 19, and 21. My formal law enforcement training includes successfully completing the Criminal Investigator Training Program, the Homeland Security Investigations Special Agent Training, and the Customs and Border Protection Training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I have received both formal and on the job training in the investigation of human and labor trafficking. I am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516, as well as authorized to execute search and seizure warrants issued under Rule 41 of the Federal Rules of Criminal Procedure.

3.   Prior to my tenure as a Special Agent, I was employed as a Customs and Border Protection Officer with the Office of Field Operations. I worked as a municipal police officer in the uniformed patrol division in the state of New Jersey prior to beginning my federal law enforcement career. I possess a Bachelor's Degree in Psychology (Magna Cum Laude) as well as several law enforcement certifications to include, but not limited to Basic Investigator, Accident Investigation, Domestic Violence and Sexual Assault Investigations, and Epidemiological Investigations. I have served since 2011 and continue to serve in the Army Reserves. I deployed as a Psychological Operations (PSYOP) Sergeant where I developed and instructed Psychological Operations courses to newly formulated PSYOP cells with our foreign partners. In 2021 I became a rated aviator in the Army flying both rotary wing and fixed wing aircraft.

4.   As a federal agent, I am authorized, under Title 18, United States Code, Section 3056, to conduct investigations of and execute warrants for offenses of labor trafficking and alien harboring, including those offenses enumerated in Title 18, United States Code, Section 1589 and Title 8, United States Code, Section 1324.

5. The following is based on my own investigation, the oral and written reports by other law enforcement officers, physical surveillance, subpoenaed records, database checks, and other investigative techniques. This affidavit sets forth a full and complete statement of the facts necessary to justify the requested warrant, but it does not detail each and every fact learned during the course of this investigation. All dates, times, and quantities mentioned in this affidavit are best approximations.

## II.

### SUBJECT PHONE IDENTIFICATION

6. Your Affiant reviewed call detail records and data relating to cellular telephone number **(503) 869-4625 (hereinafter "SUBJECT PHONE 1")**. Subscriber information shows **SUBJECT PHONE 1** is serviced by Cricket Wireless, which is owned by AT&T. Furthermore, subscriber information shows the phone to be registered in the name Araceli CRUZ, the known girlfriend of BAYONA whom which he also resides. **SUBJECT PHONE 1** has been active since June 25, 2019 and is still currently active. **SUBJECT PHONE 1** is known to belong to, and be utilized by BAYONA. Each victim encountered has provided the **SUBJECT PHONE 1** as BAYONA's phone number and have shown agents communications from BAYONA with **SUBJECT PHONE 1.** BAYONA has also provided **SUBJECT PHONE 1** as his number on a wire transfer he sent in October of 2022.

7. Your Affiant reviewed call detail records and data relating to cellular telephone numbers **(859) 494-1123 (SUBJECT PHONE 2) and (859) 285-4097 (hereinafter "SUBJECT PHONE 3")**. Subscriber information shows **SUBJECT PHONES 2 and 3** are serviced by Cricket Wireless, which is owned by AT&T. Furthermore, subscriber information shows **SUBJECT PHONE 3**, **(859) 285-4097** to be registered in the name Araceli CRUZ, the known girlfriend of BAYONA whom which he also resides (active September 19, 2022 to current). Subscriber information shows **SUBJECT PHONE 2**, **(859) 494-1123** to be registered in the name Serafin Vayona (active March 02, 2023 to current). Both of these phone numbers (**SUBJECT PHONES 2 and 3**) are known to be utilized by Juliana Trinidad BONILLA, the cousin of one of BAYONA's victims as well as another one of BAYONA's girlfriends who is also currently pregnant with his child. Several victims have provided either **SUBJECT PHONES 2 and 3** as

BONILLA's phone number and have shown agents communications from BONILLA using **SUBJECT PHONES 2 and 3.**

8. In my training and experience, I have learned that **AT&T** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

9. Based on my training and experience, I know that **AT&T** can collect cell-site data about **THE SUBJECT PHONES.** I also know that wireless providers such as **AT&T** typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

10. Based on my training and experience, I know that wireless providers such as **AT&T** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as **AT&T** typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because

the information can be used to identify **THE SUBJECT PHONES'** user or users and may assist in the identification of co- conspirators and/or victims.

11. Based on the facts set forth below, I have probable cause to believe that the requested information will result in the acquisition of evidence of a crime, contraband, fruits of a crime, or other items illegally possessed; or property designed for use, intended for use, or used in committing a crime, specifically, in violation of 18 U.S.C. § 1589 – which criminalizes the act of labor trafficking and 8 U.S.C. § 1324 – which criminalizes the act of bringing in and harboring certain aliens.

12. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.

### STATEMENT OF PROBABLE CAUSE

13. Your affiant is conducting an investigation into alleged labor trafficking and alien harboring by subject Serafin BAYONA (BAYONA) and other co-conspirators. On May 5, 2022, the Lexington Police Department was dispatched to speak with Confidential Witness #1 (CW1) regarding a potential domestic violence situation. CW1 told Police she had been in a romantic relationship with a Serafin BAYONA, but ended that relationship in December 2021. CW1 knew BAYONA because he assisted her and others in entering the U.S. from Mexico and in finding jobs upon arrival in Kentucky. CW1 ended her romantic relationship and sought a protective order against BAYONA because he had assaulted her on multiple occasions. CW1 advised that she lived at 2837 Hanna Pl, Lexington, KY along with 4 other people. She stated that BAYONA had helped many people come into the U.S. from Mexico and obtain work in Kentucky, and had provided them transportation to work. CW1 recalled on May 4, 2022, BAYONA provided her and others a ride home from work, but when they arrived he would not allow her to leave the

5

vehicle and grabbed her by the throat. Only when CW1 threatened to call police did BAYONA allow CW1 to leave. On July 2, 2022, Lexington Police Department was dispatched in reference to a separate assault of CW1. CW1 told officers she had been assaulted by BAYONA the previous night, but failed to report the assault earlier due to fear of BAYONA. On this date CW1 advised Police she was originally from Mexico, and she paid BAYONA $10,000 for him to smuggle her across the U.S. border and then to Lexington, KY. CW1 stated BAYONA may be part of a cartel and smuggles illegal immigrants across the U.S./Mexican border into the United States. Prior reports listed BAYONA as CW1's boyfriend but she stated that is no longer true.

   14.  On June 8, 2023, your affiant and other law enforcement officers interviewed Confidential Witness #2 (CW2) regarding information about BAYONA that CW2 provided to Kentucky Refugee Ministries (KRM). CW2 stated she was from Mexico and came to the United States (U.S.) in January 2023, followed shortly thereafter by her brother. CW2 and her brother were assisted in getting into the US by an individual known to her as Serafin BAYONA. CW2 was introduced to BAYONA by a friend and her aunt and uncle set up the deal for her to come to the U.S. through BAYONA. CW2 stated that every individual signs a contract with BAYONA to use his services, which she signed through her mother. BAYONA charged CW2 250,000 pesos to cross the U.S. border illegally and then receive transport to Kentucky for work opportunities. CW2 stated the journey across the border and her eventual arrival in Kentucky took a total of 15 days. She initially crossed from Sanora, a state in Mexico, into Phoenix, AZ, where she stayed for a week, and then slowly made her way to Kentucky. CW2 was provided a key word she was to provide in case she was stopped by US border patrol or by the cartels. The key word was to ensure that U.S. authorities and cartel members would know that she went through BAYONA to secure passage. CW2 believed that BAYONA had connections to the Mexican Mafia and the cartels which was how he secured passage for people across the border. BAYONA charged CW2 an additional 120,000 pesos in other fees and interest for the border crossing for a total fee of 370,000 pesos. Upon arrival in Kentucky, BAYONA charged her an additional fee of $1000 USD to secure a factory job and charged others $800 USD for a roofing job.

6

15. CW2 lives at a residence provided by BAYONA that is located at 2837 Hanna Pl, Lexington, KY. CW2 stated 13 other people also lived in the residence. According to CW2, BAYONA has multiple houses in Lexington, including a trailer near Alexandria Dr in Lexington, where he houses undocumented individuals he has assisted in coming to the United States. According to CW2 there were 34 other people in Lexington who had contracts with BAYONA to help them come to the United States from other countries without the proper documentation.

16. After arriving in Lexington, CW2 initially worked at an Orbis Factory in Georgetown, KY, and BAYONA would receive her paycheck directly from the factory. Currently, CW2 works at Montaplast factory in Frankfort, KY and she picks up her checks herself because Montaplast does not allow BAYONA to take her check. CW2 states she then must give BAYONA her check for cashing. According to CW2, BAYONA also gathers checks from everyone who has a contract with him on Fridays and cashes them at 1804 Alexandria Dr in Lexington. BAYONA charges everyone a 2% fee for cashing their checks.

17. BAYONA charges all the people under contracts weekly and monthly fees in addition to expecting them to repay their debt incurred for crossing the U.S. border. CW2 stated she has been able to keep very little of the money she has made from her job due to the fees charged by BAYONA and has not been able to send any of the money to Mexico for her children. CW2 stated all her money goes to the fees and she can't repay any of her debt, and she spoke with others who told her they have been under contract with BAYONA over a year and haven't paid any of their debt principal back. Fees include $100 a week for food, $500 a month for rent, $370 a month for transportation, and $120 a month for cleaning of the houses (although CW2 and the others do the cleaning). CW2 said that BAYONA maintains two notebooks with the debt information for each individual under contract with him. BAYONA had a large notebook for everyone's overall outstanding debt and another small notebook to track fees. BAYONA kept the notebooks with him most of the time, but also left them in his vehicle or at home. BAYONA collected fees and debt money on Fridays and Saturdays.

18. CW2 was told initially that she would be cleaning houses for work when she came to the U.S. When CW2 arrived in Kentucky and met BAYONA, BAYONA wanted her to become his "girlfriend"

and live with him at 330 Santa Fe Ct, Lexington, KY, but CW2 refused. BAYONA lives at 330 Santa Fe Ct with his girlfriend, children, and four other men. BAYONA has a girlfriend with whom he had children, but BAYONA made several sexual advances towards CW2. CW2 recalled on one occasion shortly after she arrived in Kentucky, BAYONA entered her room after she got home from work and attempted to have forced sex with her. CW2 refused to have sex with BAYONA and told him to leave her room, which he did. Since the time of her refusal BAYONA made several more attempts to hug or flirt with CW2 which she did not like or solicit. CW2 advised there was another woman who came to Kentucky around the same time she did which BAYONA successfully recruited to live with him and be another "girlfriend" for him. The mother of BAYONA's children believed that CW2 was attempting to have a romantic relationship with BAYONA and physically assaulted CW2 on at least one occasion.

19. CW2 also stated that a female named "Juliana" was another one of BAYONA's girlfriends. CW2 said that there were several times when "Julianna" would drive victims to and from work if BAYONA was not available. At a later date, "Juliana" was identified as Juliana Trinidad BONILLA, the user of **SUBJECT PHONES 2 and 3.**

20. According to CW2, BAYONA will not allow anyone under contract with him to leave without paying off their debt. CW2 mentioned to BAYONA she wanted to leave and return to Mexico and he told her if she left he would send people to kill her mother in Mexico. CW2 believed BAYONA was connected to the Mexican Mafia and the cartel in Mexico, and would use these connections to hurt her family if she or others tried to leave.

21. BAYONA owns several vehicles, but primarily drives a white Chevrolet Malibu, KY plate DOS142, registered to BAYONA, and believed to be the same Malibu identified by CW2 as the car BAYONA uses to transport her to work.. Law enforcement conducted surveillance on July 7, 2023, on the Malibu. At approximately 5:15 am, BAYONA arrived at 2837 Hanna Pl, the location identified by CW2 as her residence and the residence of multiple people under contract with BAYONA. BAYONA eventually parked and entered the residence where he stayed for 30 minutes before moving his vehicle to the street. An unknown female exited the residence, left in another vehicle parked in the driveway, then BAYONA

8

returned his vehicle to the driveway, and entered the residence. BAYONA stayed briefly inside before leaving Hanna Pl and returning a few minutes later.

22. BAYONA did not stay long at Hanna Pl before leaving again and driving to 330 Santa Fe Ct, Lexington, KY, another residence identified by CW2. BAYONA was seen with two other young Hispanic males with garbage bags outside of 330 Santa Fe Ct. The two unknown males entered a work truck parked near the residence and BAYONA returned to 2837 Hanna Pl. After approximately 30 minutes, BAYONA again returned to Santa Fe Ct briefly before returning to Hanna Pl and entering 2837 with another unknown Hispanic male. While at 2837 Hanna Pl, BAYONA returned to the white Chevrolet Malibu and retrieved a few items from the back passenger portion of the vehicle, one of the items appeared to be a notebook. BAYONA took the items to the front driver seat and appeared to look through the notebook along with other paper documents.

23. At 7:48 am that same morning, two unknown Hispanic males exited 2837 Hanna Pl, one of which was the same Hispanic male who arrived with BAYONA and loaded trash bags into the trunk of the white Chevrolet Malibu. Both unknown males entered the vehicle and left with BAYONA. BAYONA drove the white Chevrolet Malibu to 1269 Ascot Park, Lexington, KY, where more trash bags were loaded into the vehicle, before returning to 330 Santa Fe Ct where some of the bags were unloaded. At 9:00 am, BAYONA drove to the Imperial Trailer Park, trailer 115 W Louden, #H41, Lexington, KY. BAYONA stayed until approximately 9:47 am before driving to a money transfer location at 1804 Alexandria Dr, Lexington, KY, identified by CW2 as the location where BAYONA cashed victim's checks.

24. BAYONA arrived at 1804 Alexandria Dr at approximately 10:05 am and parked the white Chevrolet Malibu near the entrance to the money transfer business. From time of arrival until 1:20 PM BAYONA moved his vehicle to a different spot in the general area 3 different times. Each time BAYONA parked in a new spot, he remained in the vehicle and no other person entered or exited the vehicle. Just prior to BAYONA's arrival at 1804 Alexandria Dr, Lexington Police Department traffic cameras were monitored and showed BAYONA, while stopped at a traffic light, sorting through papers consistent in size

with checks or pay stubs. While BAYONA sat in his vehicle near 1804 Alexandria Dr, he could be seen looking at his phone.

25. On July 7, 2023, law enforcement interviewed CW2 for a second time. CW2 explained BAYONA's movements on the morning of July 7 were due to BAYONA trying to find four victims who ran away. CW2 stated BAYONA normally transports her to work in the morning but did not on the morning of July 7 because of everything that was happening. CW2 was shown pictures of individuals seen with BAYONA loading trash bags into the white Chevrolet Malibu and CW2 identified them as victims of BAYONA in the same situation as herself. CW2 also stated that the only way she communicated with BAYONA was via WhatsApp, an app connected to telephone number 503-869-4625, **SUBJECT PHONE 1.**

26. On July 2, 2023, Lexington Police Department responded to 115 W Loudon Ave, #H41, Lexington, KY (the same location referenced in surveillance on July 7) to speak with victim Confidential Witness #3 (CW3). CW3 told Lexington Police that he was threatened with a gun because he had not paid enough money towards his debt. CW3 told officers he was in debt to a Serafin BAYONA because BAYONA helped him enter the U.S. illegally. During the report it was determined that Serafin BAYONA was the same individual identified in this investigation. The officer taking the report then contacted the FBI and a time was set to speak with CW3.

27. CW3 stated he was introduced to BAYONA through his brother-in-law to assist him in coming to the U.S. BAYONA charged $35,000 Pesos up front to cover the expenses for the trip then $250,000 Pesos for crossing into the U.S. Six months after arriving in the U.S., BAYONA would begin to charge interest on the original debts (normally about 10%). CW3 stated he left his home on April 2, 2023, and arrived in Lexington, KY either April 20th or 21st, 2023. Once he left home he was to meet people in Mexico City where they would then enter the U.S. without inspection across the border at Naco, Sonora, utilizing a password. Without the password, no one was able to cross into the U.S. with the others contracted with BAYONA. After crossing, they were housed in a trailer park in Arizona until the next set

of people would come and pick them up. CW3 pointed out the location of the trailer park on Google Maps where they were housed, which is just north of Naco, Sonora.

28. After arriving in Lexington, KY, CW3 stated BAYONA would charge several fees in addition to the debts that were owed for crossing into the U.S. CW3 stated BAYONA charges people to find work, transportation to and from work, and rent, among other fees. Additionally, BAYONA takes other victim's paychecks and cashes them, leaving them with no money. CW3 told agents of a time when he used some of his pay to purchase new clothes. When BAYONA saw the new clothing, he was angry and charged CW3 $100 as a fee for buying his own clothes. CW3 stated other victims were charged even more than CW3.

29. CW3 observed BAYONA with two different notebooks (one opening from the top and another opening from the side like a book). BAYONA used one notebook when he would collect the additional fees and another when he would come to collect the original debts and interest. This corroborates information received from CW2 who stated BAYONA has two different notebooks utilized to separate fees and debts from his victims.

30. CW3 stated BAYONA never takes CW3's paycheck because he gets paid in cash. Until just recently, CW3 gave BAYONA most of his pay (approximately $800-$900 USD) so that he could repay his debt quicker. When CW3 realized he was not going to be able to repay his debt with all the added fees and interest, he stopped giving BAYONA most of his pay.

31. On Saturday, July 1, 2023, BAYONA came by CW3's residence (115 W. Loudon Ave H41, Lexington, KY 40508) to collect his fees and debt. CW3 stated he gave BAYONA $200, which is less than he's given him in the past, and BAYONA was upset. The following day BAYONA returned to CW3's residence and threatened him with violence if he did not pay BAYONA, and further stated was going to have his contacts in the Mexican Mafia kill CW3's family in Mexico. BAYONA kept gesturing towards his hip as if he was reaching for a gun. CW3 stated he did not see a firearm, but BAYONA continued to motion as if he was going to use a gun if CW3 didn't pay him. CW3 stated BAYONA was driving the **aforementioned Chevrolet Malibu** during this incident. CW3 stated BAYONA was known to carry a

11

handgun and made it known to his victims that he had one. CW3 knew of another victim who BAYONA threatened with his handgun when they attempted to stand up for a friend who was getting charged higher fees than others.

32. After the incident CW3 reported on July 2, 2023, law enforcement attempted to make contact with CW3 on Thursday, July 6, 2023, for follow up questions. CW3 was not at his residence, but BAYONA's brother, Jose BAYONA, was there. CW3 stated he never met Jose BAYONA, nor does Jose BAYONA live at the trailer on Loudon Avenue. Additionally, CW3 stated Jose BAYONA never went to the trailer and did not have a reason to be there. Jose BAYONA never collected money or conducted business on Serafin BAYONA's behalf. CW3 stated he did not because he does the same thing as Serafin BAYONA and has victims of his own.

33. CW3's wife and other family members, who are in Mexico, have received threatening phone calls from unknown individuals that are connected to BAYONA. CW3 stated on Thursday, July 6, 2023, BAYONA took CW3's brother-in-law's car, a white Ford Mustang, because BAYONA thought he was going to try and run away. Later that night, his brother-in-law, his girlfriend, and his cousin managed to leave and are currently in hiding. CW3 provided a recording sent to him on Saturday, July 8, 2023, from his niece, who is still in Mexico. In the recording, the young child was speaking Spanish and can be heard to say among other comments:

"Uncle, I'm very scared because Serafin is going to kill us… We don't have anywhere to go."

CW3 stated his niece and two other family members fled to a neighboring city and are currently at a hotel, hiding from the individuals threatening them. The same day the recording was sent, CW3 was contacted by Martinez who told him BAYONA and three others went to the trailer on Loudon to look for him. CW3 stated he never went back to the trailer and is currently staying at another location and he feels safe there.

34. CW3 stated BAYONA primarily communicates through WhatsApp phone calls since most of the people he communicates with have phone numbers from Mexico. CW3 provided BAYONA's phone number as (503) 869-4625 **(SUBJECT PHONE 1)**, the same number identified by CW2. BAYONA

communicates threats to victim's families through his people in Mexico, including family of BAYONA in Mexico who maintain documents of all BAYONA's victims.

35. Additional victims, CW4 and CW5 spoke with agents after they fled 330 Santa Fe Court, Lexington, KY. CW4 and CW5 stated they were held in the garage of the residence against their will and that BAYONA placed both BONILLA and BAYONA's cousin "Fermin" in charge of overseeing the victims in the garage and making sure they didn't escape. CW4 and CW5 managed to escape and fled out of the state. During their interviews, CW4 and CW5 showed agents video of BAYONA and BONILLA outside of the out-of-state location where CW4 and CW5 were hiding. The video showed BAYONA and BONILLA standing outside of the white Chevrolet Malibu. This occurred on July 11, 2023 (before installation and monitoring of the GPS tracking device currently installed on the vehicle). Since the time of their escape, BAYONA has continued to threaten CW4 and CW5 and their families residing in Mexico. BAYONA's threats have grown increasingly violent. Most recent of the threats BAYONA has texted something to the effect that he no longer wants CW4 and CW5's money, but he wants them to pay with their life. Screenshots of the messages were obtained and again, the number provided by CW4 and CW5 was (503) 869-4625 **(SUBJECT PHONE 1)**.

36. CW4 also provided text messages from his cousin, BONILLA, showing her involvement with BAYONA's activities, including sending pictures of identification cards and account numbers to have CW4 send money from a check cashing business to Mexico, and sending messages after their escape asking where CW4 and CW5 were and trying to get them to return. BONILLA is also related to the family members of CW4 and CW5 that assisted CW4 and CW5 after they fled out of state. BONILLA contacted those family members to ask if CW4 and CW5 were with them. The family members, unaware at the time of the circumstances of CW4 and CW5's situation and escape, told BONILLA that CW4 and CW5 were in fact staying with them. It was due to BONILLA that BAYONA knew were CW4 and CW5 were hiding and resulted in BAYONA and BONILLA traveling to CW4 and CW5's location on July 11, 2023.

**IV.**

**AUTHORIZATION REQUEST**

37.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

38.     I further request that the Court direct **AT&T** to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on **AT&T,** who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

39.     I further request that the Court order that **all** papers in support of this applications including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, which include, not limited to, giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution. Additionally, I am concerned that, given the ongoing criminal conduct of BAYONA, providing early notice to an actively operating human trafficker could result in the destruction of evidence, movement of victims, potential danger to victim's families, and/or the disappearance of various co-conspirators known and unknown.

                                              Respectfully submitted,

                                              /s/ Melanie S. Dry
                                              Melanie S. Dry
                                              Special Agent
                                              Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __25__ the day of October 2023.

_____
HONORABLE MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE